**Lamar ALEXANDER, Appellant,**

v.

**Caspar WEINBERGER, Appellee.**

**No. 75–1854.**

United States Court of Appeals, Eighth Circuit.

Submitted May 12, 1976.

Decided June 9, 1976.

Sidney Fortus, Anderson, Green, Fortus & Lander, Clayton, Mo., for appellant.

Jean C. Hamilton, Asst. U. S. Atty., St. Louis, Mo., for appellee; Donald J. Stohr, St. Louis, Mo., on brief.

Before BRIGHT and WEBSTER, Circuit Judges, and TALBOT SMITH, Senior District Judge.*

BRIGHT, Circuit Judge.

Lamar Alexander appeals the order of the district court affirming the final determination of the Social Security Administration denying him disability insurance benefits under provisions of Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*[1] The record in this case discloses that Alexander lost a portion of his right leg in an industrial accident on August 11, 1971, and filed an application for disability insurance benefits on October 23, 1973.[2] The Social Security Administration considered, reconsidered, and finally denied his application on March 13, 1974. Thereafter, an administrative law judge, after a hearing, rejected Alexander's claim in an opinion dated September 9, 1974. The Appeals Council of the Social Security Administration affirmed this decision on December 16, 1974. This determination became the final decision of the Secretary of Health, Education and Welfare. Alexander then filed suit pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Secretary's decision. In response to cross-motions for summary judgment, the district court sustained the administrative decision as supported by "substantial evi-

---

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

1. The Act defines "disability" in relevant part as the

    (A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment * * * which has lasted or can be expected to last for a continuous period of not less than 12 months * * *.

    * * * * * *

    (2) For purposes of paragraph (1)(A)—

    (A) an individual * * * shall be determined to be under a disability only if his physical or mental impairment or impair-

ments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. * * * [42 U.S.C. § 423(d).]

2. Alexander says he initially filed for disability benefits in January 1972, but the Social Security Administration found no record of this application.

dence on the record as a whole." This appeal followed. We reverse and rule that Alexander was entitled to disability benefits from August 11, 1971 to January 8, 1973.

This appeal focuses on the single issue of whether the record contains sufficient evidence to support the Secretary's decision that Alexander could have engaged in substantial gainful employment within 12 months from the date of his accident. In answering this question in the negative, we have reviewed Alexander's work record, his subjective complaints, his medical records, and all other evidence bearing on this question.

## I. The Work Record.

On August 11, 1971, while working at a General Motors plant in St. Louis, Missouri, Alexander was caught between two forklifts, sustaining a severe injury to his right leg which necessitated amputation just below the knee as well as some injury to his left knee and back.

Alexander first returned to work at General Motors August 15, 1972, slightly more than 12 months after the accident. At that time, he was classified as a "crib attendant." Although he claims that he was sent home shortly thereafter, a letter in the record from General Motors to Alexander recites that he worked until September 12, 1972. Alexander testified that he could work only 2–3 hours per day, 2–3 days per week as a crib attendant. According to the letter from General Motors Alexander was on sick leave from September 12 to January 8, 1973. He returned to work on January 8, 1973, and continued working until May 14, 1973, when he again obtained sick leave extending to June 27, 1973. Although classified as a crib attendant throughout this period, Alexander testified that since that job required continual standing and he could not do this; most of the time he merely sat, not working. General Motors reclassified him as an "elevator operator" on December 11, but again classified him as a crib attendant on February 4, 1974. He was laid off on February 11, 1974, because of a reduction in the work force. He was not recalled to work on the basis of seniority because General Motors determined he was "physically unable to perform available work."

## II. Medical Testimony.

Alexander was discharged from the hospital on August 29, 1971, and his discharge summary, prepared by his attending physician, Dr. Earl L. Holt, Jr., reads as follows:

> This 31 year old employee of Cheverolet [sic] Plant in St. Louis was admitted via ER on the evening of 8–11–71, because of virtual amputation of his right leg a few inches above the ankle. He had had the foot caught between a fork lift in [sic] the wall. Amputation was performed at the site of election above the fractures and the stump was closed. His PO course was satisfactory but there was some indolence in the [sic] healing of the wound. At the time of discharge he was afebrile and was requiring only a small dressing and wrap of the stump. Office follow-up is planned.

The record does not show any further report of Dr. Holt during the next two years. However, the record discloses that on the same day Alexander returned to work at General Motors, August 15, he reported to the plant dispensary at the close of work that day. The notes in the dispensary treatment book quote Alexander as saying:

> Dr. Holt told me to come back to work on the 15th. He told me to see if I could work part time according to what they [apparently General Motors] had. All I can do is sit down. Can't stand up. What are they going to give me to do?

Alexander returned to the dispensary the next day and the notes indicate that the examining physician noted that Alexander "should have sitdown job to start."

The next medical record shows Alexander's admittance to the Christian Hospital of St. Louis on September 11, 1972, and discharge on September 16, 1972. Alexander's principal complaint on admission related to epigastric pain, gas, nervousness, as well as backache. The hospital's admission

diagnosis disclosed prostatitis, gastritis, and possible mental depression. His condition had improved on discharge.

Dr. Edward C. Holscher, an orthopedic surgeon, submitted a medical report to the General Motors claim department of his examination made on October 30, 1972, on referral from Dr. Holt, Alexander's initial physician. This examination related to Alexander's problems secondary to the below-knee amputation.[3] Dr. Holscher commented:

He was walking with the aid of a cane in the right hand, protecting full weight-bearing through a patellar tendon bearing prosthesis having a thigh suspension cuff and SACH foot. The prosthesis was at least ¼″ over-length. It tended to in-toe and there was excessive wear along the medial border of the sole and heel. A soft liner showed signs of excessive pressure points and had become dry and had a large buckled area in the posterior wall. He was using (a 3 and a 5-ply) woolen socks. The stump was well-contoured and had good soft-tissue coverage terminally, but there was a small, partially crusted area of erosion in a sulcus of the scar terminally between the tibial and fibular ends. The surrounding terminal soft tissue was quite sensitive to any light to moderate pressure made through it, indicating inflammatory reaction. The stump surface elsewhere was in good shape though a slight pressure irritation was present from the socket over the internal condyle of the femur and there was some tendency to bursal formation laterally over the quadriceps tendon. The actual bone length of the stump was 8″, measured from the tibial plateau to the saw-cut level.

Comment: I believed his condition merited a re-amputation at around the 6-inch tibial level to correct the low grade inflammatory condition terminally. A sinus seemed probable. A new PTB prosthesis with soft liner would be indicated after satisfactory wound-healing oc-

curred. Depending on the type of work he might be planning would be the decision whether or not to have him use side-strap knee hinges and a long thigh corset.

Subsequently, an osteopathic orthopedic surgeon, Dr. William F. Luebbert, furnished Alexander's attorney with a report of an examination conducted March 28, 1973. In addition to noting Alexander's complaints, Dr. Luebbert stated that the prosthesis did not fit properly and had caused a development of an ulcer at the site of the amputation stump. He further observed a partial disability in the left knee. Because of the patient's complaints about back problems, Dr. Luebbert recommended physical therapy and traction.

The record further discloses that Alexander entered another St. Louis area hospital on May 22, 1973, complaining of stomach pain and that the final diagnosis was listed as an ulcer. The examining physician commented that a psychiatric consultation might be beneficial.

Finally, at the request of Alexander's attorney, a psychiatrist, Dr. Walter L. Moore, examined Alexander in June of 1973. Dr. Moore concluded in his psychiatric diagnosis as follows:

Psychoneurosis, anxiety state type with depression, moderately severe.

The patient should be under the care of a neuropsychiatrist for continued examination as well as for psychiatric treatment —anti-depressants, and reassurance and supportive psychotherapy. According to the history as given by the patient, in my opinion, this psychoneurosis and his low back pain with a radicular type of recurrant [sic] episodes was precipitated by his accident.

A supplementary report by Dr. Moore dated March 1, 1974, found Alexander "[p]sychiatrically * * * markedly improved * * and able to work regularly * * *."

Finally, the original attending physician, Dr. Holt, submitted a report of an examina-

**3.** Dr. Holscher noted that Alexander's other knee had been giving the patient some discom-fort but appeared quiescent at the time of the examination on October 30th.

tion dated November 16, 1973, in which he noted that Alexander had been fitted with a prosthetic appliance within a few months following the accident and provided with a second prosthetic limb of better design furnished on May 28, 1973. He reported:

> By no stretch of the imagination is he totally disabled since his disability is entirely a matter of a below knee amputation of the right leg. He has no disability of the back or the opposite leg despite his claims to the contrary. I last saw him October 15, 1973 for a small area of friction at the tip of the stump for which some recommendations were made.

Unfortunately, Dr. Holt's report does not purport to evaluate Alexander's condition at the expiration of the healing period or immediately prior to the time that Alexander first returned to work on August 15, 1972.

Alexander testified that on his initial return to work on August 15, 1972, he worked only a few hours each day for several weeks and then left the job altogether because his stump was open and draining and he could not stand for any period of time as his job required. He did not return again to work until January 8, 1973. He states that while he was on the payroll for about 45 days after August 15, he in fact did not produce any work.

At the hearing before the administrative law judge, a consulting industrial psychologist, Thomas Boyd, testified concerning Alexander's capabilities for employment, particularly with respect to the claimant's ability to do light or sedentary work.[4] In response to a hypothetical question which assumed no physical impairment to Alexander for performing sedentary work activities, Boyd testified that he believed such employment opportunities existed in the St. Louis area. On cross-examination, Boyd conceded that he was not able to testify as to whether Alexander had the physical capacity to perform jobs described as seden-

tary between the time of his injury and August 1972, the date Alexander first returned to work. Boyd further noted that "if he [Alexander] wasn't physically able to do it [sedentary work], then he couldn't do those jobs, no way." Boyd also recognized that Alexander's background and training reflected capabilities involving either manual labor or physical dexterity in the use of his hands.

### III. *Summary and Conclusion.*

In summary, the record discloses a 33-year old man employed in manual labor throughout his working life who sustained a severe traumatic injury to his right leg resulting in amputation below the knee. The subsequent medical reports support Alexander's subjective complaints that at or about the time he attempted to return to work with General Motors in August 1972, that his stump ulcerated causing pain and that during this period and subsequently he suffered nervousness, depression, gastric complaints, intermittent low back pain, and some difficulties with his knee on the non-amputated leg.

The record is completely bare of evidence that any physician believed Alexander could perform light or sedentary work at any time prior to the date that he actually returned to General Motors on August 15, 1972, or that he successfully performed either light or sedentary work functions at General Motors during the several weeks of August and early September that he attempted to work. Records of the dispensary at General Motors support Alexander's later testimony at the hearing before the administrative law judge that in August 1972, he could do no work involving any standing. Indeed, Dr. Holscher's examination on October 30, 1972 (*see* pp. 782–536, *supra*), showed that the soft tissue on the stump was sensitive to any light to moderate pressure, indicating inflammation. Dr. Holscher further recommended

---

4. Light work is essentially defined as lifting up to 20 pounds and carrying up to 10 pounds, with considerable walking and standing. Sedentary work is essentially defined as tasks per- formed in a generally seated position with occasional walking and standing and lifting up to ten pounds.

**784**

reamputation and spoke in terms of "the type of work he might be planning."

■ The burden of establishing a disability is on the claimant. *Klug v. Weinberger,* 514 F.2d 423, 424 (8th Cir. 1975). Furthermore, the Secretary's decision is conclusive if supported by substantial evidence based on the record as a whole. *Id.* at 425; *Yawitz v. Weinberger,* 498 F.2d 956, 957 (8th Cir. 1974).

Nevertheless, the Supreme Court has defined "substantial evidence" as used in the Social Security Act to be " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938).

■ Here, we can find no evidence in the record justifying a finding that Alexander could do even light or sedentary work, prior to August 15, 1972. Indeed, the record indicates that Alexander could not do light or sedentary work satisfactorily until at least January 8, 1973, when he returned to work at General Motors and continued working until May 14, 1973.[5]

Since the definition of sedentary work requires occasional standing and some lifting as testified to by the occupational specialist, Thomas Boyd, the record as a whole offers no support for a finding that Alexander was capable of performing this type of work within 12 months of his accident. Indeed, the record conclusively establishes that the claimant could not have engaged in substantial gainful employment for a continuous period from the date of the accident, August 11, 1971, to at least August 15, 1972, and beyond. We thus conclude that Alexander suffered a disability under the

Social Security Act and is entitled to appropriate disability insurance benefits. This record supports the allowance of disability benefits to January 8, 1973, when Alexander returned to work at General Motors the second time and remained on the job for over four months.

Accordingly, we reverse and remand this case to the district court with directions to grant summary judgment for the plaintiff consistent with this opinion.

5. The Government, in part, relies upon a report of a Social Security representative who contacted a person associated with Hanger Prostheses, Inc. which provided Alexander with his artificial limb. That report of contact noted that the representative of the artificial limb company stated that Alexander was "ambulating well by 8/11/72 the anniversary date of the amputation. He [the Hanger representative] said the adjustments made were for stump shrinkage which is routine. He also said that the second prothesis was ordered, not because the first one was ill fitting, but was a better quality than the first since they were waiting for shrinkage." This report in no way bears upon Alexander's experience with the prothesis when he began working.